```
                  UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF IOWA


IN RE:                          )
                                )     Chapter 11
ROBERT K. MIELL,                )
                                )     Bankruptcy No. 09-01500
     Debtor.                    )
```

**ORDER RE: MOTIONS TO CONVERT**

This matter was heard on September 23 and 28, 2009 on Motions to Convert to Chapter 7 filed by the U.S. Trustee and Heritage Bank, along with joinders and objections filed by multiple parties. After the presentation of evidence and argument, the Court took the matter under advisement. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

**MOTIONS AND JOINDERS**

Motions to Convert to Chapter 7 were filed by the U.S. Trustee and Heritage Bank. Objections to the Motions to Convert were filed by Debtor Robert Miell and Trustee Hanrahan. Simmons Perrine joins in these objections. The following filed joinders to one or both of the Motions to Convert: Luana Savings Bank, BankIowa, Farmers State Bank, Collins Community Credit Union, Linn County State Bank, University of Iowa Community Credit Union, American Family Mutual Insurance Company, State Farm Bank, F.S.B., Bankers Trust Company, Hills Bank & Trust Company, First Federal Credit Union, Bank Iowa, and Guaranty Bank & Trust Co.

As grounds for converting to Chapter 7, U.S. Trustee states the bankruptcy estate is incurring significant expenses, including more than $100,000 in professional fees. Substantial real estate taxes were unpaid prepetition, some of which are accruing interest at 24%. Additional taxes are due in September 2009.

Heritage Bank has 42 mortgages on 65 parcels of real estate. It asserts cause to convert to Chapter 7 exists based on declining occupancy of rental units, lack of insurance, inability to pay September 2009 real estate taxes, high professional fees, possible utility shut-offs and Trustee's lack of information regarding the status of various properties.

Thirteen parties, most of whom are secured creditors, join in U.S. Trustee's and Heritage Bank's motions to convert. Many of them have advanced real estate taxes to protect their collateral interests. They also note the lack of insurance on

the real estate and express doubt about Debtor's ability to effectuate a Chapter 11 Plan.  Some of the joining creditors assert the collateral real estate is not being occupied or maintained, and there are insufficient funds for repairs, insurance, real estate taxes or tax redemption.  They allege Chapter 7 liquidation is in the best interests of creditors to avoid further losses in Chapter 11.

## OBJECTIONS

Debtor objects to conversion.  He states Trustee Hanrahan's appointment resulted in business decisions which have generated significant administrative expenses and reduced rental income.  Trustee terminated Debtor's employees and hired multiple property management companies.  The rent-roll occupancy level is down.  Debtor asserts he filed Chapter 11 in a good faith effort to reorganize.  He believes he has tremendous equity in the real estate and, when properly run, there is significant cash flow and the business is profitable.  Conversion is premature and will not maximize value for creditors.

Trustee objects to conversion.  She has collected July and August rents and is working diligently to determine the cash flow of Debtor's complex business.  All proceeds are being held in segregated accounts.  Significant equity will be lost if the case is converted, which will result in priority claimants receiving little or nothing.  Trustee asserts sufficient information is not yet available to know whether conversion is appropriate.

Unsecured creditor Simmons Perrine Moyer Bergman states conversion is less likely to result in recovery for unsecured creditors.  If the real estate is all liquidated, it will flood the market and be sold under value.  A Plan of Reorganization could eliminate underperforming parcels and increase cash flow.  It is too early to know whether reorganization is possible.  The Court needs proof of value and equity before deciding whether conversion is appropriate.  Administrative expenses will be reduced as Trustee's learning curve flattens out.

## FINDINGS OF FACT

Debtor filed this voluntary Chapter 11 case on May 28, 2009.  His business is a property management company which oversees a large number of mostly residential rental units in Cedar Rapids, Iowa.  His schedules disclose real estate holdings valued at more than $69 million.  There are approximately 460 properties which include a total of 850 rental units.

In 2004, American Family Mutual Insurance Co. sued Debtor, alleging he had committed insurance fraud in 2001 and 2002 by submitting false documentation of roof repairs.  On January 15, 2008, a jury returned a verdict for American Family finding clear and convincing evidence of Debtor's fraudulent misrepresentation and "willful and wanton disregard" warranting punitive damages of more than $1 million.  The total judgment entered January 31, 2008 is $1,565,096.74.  On the petition date, Debtor owed American Family $1,090.968.27 on the judgment.  American Family has filed a complaint seeking to except this debt from discharge.

In November 2007, a federal grand jury indicted Debtor on counts of mail fraud, perjury and filing false tax returns.  On January 5, 2009, Debtor pled guilty to the mail fraud charges and two of the perjury charges.  On January 9, a jury found him guilty on the tax fraud charges.  Debtor now awaits sentencing on these charges.

Prepetition, between early February 2009 and May 12, 2009, three of Debtor's mortgage lenders sought and received appointments of receivers in foreclosure actions in Iowa District Court in Linn County.  Eleven days after the Chapter 11 petition was filed, with Debtor's eventual consent, this Court appointed Renee Hanrahan as the Chapter 11 Trustee.  Thus, the Chapter 11 Trustee has been operating Debtor's business for approximately three and a half months, and court-appointed receivers were in place prepetition for a large number of Debtor's properties for approximately the same length of time.

After her appointment as Trustee, Ms. Hanrahan hired attorneys, three property managers, including those appointed as court-appointed receivers, and an accountant.  Recently, the Court has approved payment of compensation to these professionals and to two secured creditors who requested compensation as custodians.  The total of the compensation awarded is more than $130,000.  In addition, Trustee will apply for compensation for her accountant of more than $13,000 and Debtor's attorney has requested fees and expenses of $47,551.10.

**TESTIMONY OF TRUSTEE**

Trustee testified that, as set out in U.S. Trustee's Exhibit 3, real estate taxes coming due in September 2009 total $553,769.  In addition, delinquent real estate taxes are $167,775, plus penalties of 1.5% per month, and the amount needed to redeem real estate from tax sales is $339,628, plus interest of 2% per month.  In total, these three amounts represent real estate taxes owed on Debtor's property of more than $1,061,000.  Trustee stated that,

3

if she receives consent of secured creditors, she believes she could pay the September 2009 real estate taxes with funds from rents segregated for each creditor plus unencumbered cash collateral. She considers rent from unencumbered properties and properties being purchased by contract to be unencumbered cash collateral.

Since Trustee was appointed, the bankruptcy estate has not paid adequate protection payments to any secured creditors. Trustee testified that she first had to stabilize the business and determine whether there was adequate cash flow to make adequate protection payments. Trustee stated she believes that this case should remain in Chapter 11. Based on July and August receipts, she believes a Chapter 11 plan can be developed. Trustee testified that some of the portfolios of property have income which could benefit unsecured creditors and she believes there may be considerable equity in some of the properties.

The rental units currently have a 68% occupancy rate. Trustee believes this low rate can be explained in part by market conditions and by the poor condition of many of the rental units. Generally, property managers expect a vacancy rate of 10% in residential rental units in Cedar Rapids. Debtor believes the prepetition vacancy rate was between three and five percent. This cannot be verified because few prepetition financial records exist. Trustee testified that, when she took over operations, there was no centralized bookkeeping system.

In addition, after Trustee was appointed, she could not find copies of leases. There were no accountings of rent received prior to her appointment. Some keys were available, but most of them did not open the apartments for which they were tagged. Trustee put insurance in place through Farmers Insurance Group for any properties that needed insurance. She continues to add insurance with Farmers Insurance as current insurance policies expire or come due. Trustee is working with Farmers Insurance to resolve the insurance status of 50 of the properties. Five of the properties are uninsurable – three were flooded in June 2008, one had siding problems, and one had been damaged by a fire.

### DEBTOR'S WITNESSES

Debtor presented the testimony of Ms. Hope Huenefeld who worked for Debtor's business for approximately three years. She testified that she worked on Debtor's rental units to get them ready for new tenants. She and other workers could routinely make a unit ready for occupancy within one to seven days after a tenant moved out. It was routine to spray for bugs on a weekly

4

basis.  Ms. Huenefeld stated that she never had a problem finding a key when she needed to get into an apartment.  While she was employed, maintenance was being done regularly.  Known issues which needed repair would be fixed in a very short time.

Dale Becwar testified that he would provide services for Debtor's properties if Debtor's Chapter 11 Plan is confirmed.  He would take care of the units to get them fixed up and rented.  He has run a property service company for 22 years.  He believes all the rental units could be in rentable condition within two or three months.  Mr. Becwar testified that he hasn't seen any of the properties.  He would be the chief of maintenance for Debtor's business, handling all the outside properties with the help of Debtor's prior employees.  He would not be involved with office management.

Gary Williams testified that he would act as the manager of Debtor's business if Debtor's Plan is confirmed.  He has 27 years experience in the finance industry and had been employed by local banks.  Debtor hired Mr. Williams in March 2009.  He assisted in preparing Debtor's bankruptcy petition and schedules.  Mr. Williams testified that there were very few vacancies prepetition and he believed the operation could be successful with the help of Mr. Becwar and others.  Mr. Williams has not inspected any of the properties and has no experience in property management.  He testified that the proposal in Debtor's plan to have 30-year terms on secured debt is not normal in the banking business for loans on rental properties.  He believes there is equity in the property based on current assessments and appraisals from the past five years.

## SECURED CREDITORS' EVIDENCE

The parties who moved to convert or joined in the motions to convert presented evidence relating to several general categories of issues.  These concerns include 1) the repair and maintenance of the rental units, 2) overdue real estate taxes, 3) the lack of financial records, 4) Debtor's failure to account for security deposits, 5) proof of insurance, and 6) negative cash flow.

### Real Estate Taxes

Trustee testified that unpaid real estate taxes equal approximately $1,061,000, including those due in September 2009, delinquent taxes and the cost to redeem tax sale certificates.  Many of the lenders have paid taxes or redeemed tax sale certificates to protect their interest in the real estate.  For example, State Farm Bank Exhibit SFB-1 shows that part of the

Bank's claim includes protective advances of $580,395 for real estate taxes. Exhibit UICCU-3 shows that the University of Iowa Community Credit union paid real estate taxes of $115,270. There is evidence in the record that Debtor has failed to pay real estate taxes, in part, since 2006.

### Insurance

Testimony by lenders and property managers also indicates problems with insurance coverage. Trustee has put insurance coverage in place through Farmers Insurance Group. At the time of the hearing, approximately 50 properties were not yet insured. Julie Beres testified that State Farm Bank has force placed insurance policies on 115 of the 132 properties in its portfolio. She stated that this more expensive insurance is necessary because the Bank has not received satisfactory proof of insurance regarding these properties from Debtor or Trustee. Carolyn Lathrop, a Farmers Insurance agent, testified that she doesn't believe force placed insurance is necessary because most of the properties are now insured by Farmers. She stated she understood the lenders' concerns about the status of insurance policies in June, but their collateral is now insured. Ms. Lathrop admitted, however, that Farmers' home office has not yet provided declarations and policies for the lenders.

### Financial Records and Security Deposits

Tom Slattery of Heritage Property Management Co. was appointed prepetition as receiver for 132 properties for State Farm Bank, and has continued managing the properties for Trustee. Tim Conklin of Preferred Property Management also manages some of Debtor's properties for Trustee postpetition and acted as a receiver prepetition. Mr. Slattery, Mr. Conklin and Trustee all testified that they were unable to find financial information at Debtor's offices. Debtor had no records regarding the whereabouts of security deposits which should have been held in a segregated account. Those funds remain missing and have not been accounted for. In addition, rent collected by Debtor prepetition, as well as postpetition rents in June, are not accounted for. Trustee testified that a "Yarde" computer system at Debtor's office included some records regarding the properties, but did not contain information regarding where Debtor held funds.

### Maintenance and Repairs

Several witnesses testified about maintenance and repair problems. In general, the current property managers agree that

much required maintenance had been deferred by Debtor. They stated there was water damage and mold in some of the rental units caused by faulty plumbing or leaky roofs which should have been repaired. Insurance claims for water damage from storms in August have been denied for this reason. The insurance company believes claims based on water damages were caused by something other than the August storms.

In addition to deferred maintenance problems, some of the properties have problems with cockroaches, fleas and other pests. Mr. Conklin testified Debtor did not screen prospective tenants. Mr. Slattery testified that he inspected an apartment building on Blairs Ferry Road and observed illegal behavior such as drug dealing and prostitution. Ms. Huenefeld also testified that some properties were damaged by tenants. She stated, however, that Debtor performed proper maintenance and repairs on all rental units.

Abby Stewart testified as Guaranty Bank's property manager. She stated she visited seven vacant properties for the Bank and found them in very poor condition. There was significant pet damage, mold, flea infestation, human and animal waste. One property required approximately $9,000 of work to make it rentable. Mr. Conklin testified that the 52 apartments he manages will require approximately $3,000 per unit to correct the problems caused by poor maintenance, non-working appliances, leaking roofs or plumbing and soiled carpets. State Farm Bank's Exhibit SFB-11 shows maintenance costs from May through August total $111,738.93. It has mortgages on 132 properties which have been managed by Mr. Slattery as receiver since February 2009.

### Cash Flow

Trustee's Exhibit RKH Trustee A sets out a projected monthly cash flow for all of Debtor's properties, summarized by each lender's portfolio of properties. Trustee testified that of the 31 portfolios, 10 have positive cash flow which could pay related secured claims with additional income available for unsecured creditors. She stated she did not believe any funds could be realized for unsecured creditors if the case was converted to Chapter 7. If it remains in Chapter 11, Trustee could reduce the size of the total portfolio to allow income to flow to creditors.

Exhibit RKH-A shows a monthly total cash excess, before paying lenders and delinquent taxes, of $149,576.81, based on an average of the actual rent received and expenses incurred in July and August. The amount needed to pay minimal mortgage payments, over 30 years at 3.25% interest, is $171,633.05. Making minimal

payments to redeem tax sale certificates and pay delinquent taxes would require monthly payments of $9,770.40 and $3,009.47, respectively.  Thus, the total needed to pay the lowest amount possible on mortgage payments and delinquent real estate taxes is $184,412.92, or $34,836.11 more than the monthly cash available.  Debtor asserts that this presumes a high vacancy rate of more than 30%.  He believes a vacancy rate of two to three percent is possible and the properties can cash flow by paying secured claims with 4.25% interest over 30 years, as proposed in his Chapter 11 Plan.

State Farm Bank calculated cash flow under Debtor's proposal in Exhibits SFB-4 and SFB-9.  With payments over 30 years at 4.25% interest and a two percent vacancy rate and 29% maintenance reserve, the Bank calculates that Debtor would still have a monthly deficit of $639.80.  John Higgins testified for the Bank that both the vacancy rate and the maintenance reserve Debtor proposes are unrealistically low.  Exhibit LSB-2A shows that with a more realistic 10% vacancy rate, there would be a monthly deficit of $2,829 for payments on Luana Savings Bank's portfolio of properties.  The U of I Credit Union's Exhibit UICCU-2 shows positive monthly net income for its portfolio of $8,977.93, before taking into account property tax and insurance.  It notes, however, that Debtor would have to come up with an additional $10,000 to make his monthly mortgage payment under his proposed cram down loan terms.

## CONCLUSIONS OF LAW

The motions to convert filed by the U.S. Trustee and Heritage Bank are based on 11 U.S.C. § 1112(b), which states:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.
>
> (2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief

8

> is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that –
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)--
>
> (i) or which there exists a reasonable justification for the act or omission; and
>
> (ii) that will be cured within a reasonable period of time fixed by the court.

Prior to the 2005 amendments to the Bankruptcy Code, most courts held that a bankruptcy court has broad discretion under § 1112(b) to either dismiss a case or convert it from Chapter 11 to Chapter 7. In re Hedquist, 450 F.3d 801, 804 (B.A.P. 8th Cir. 2006) (applying pre-BAPCPA law).

> Following BAPCPA's 2005 amendments to the Bankruptcy Code, section 1112(b)(1) is "no longer permissive, but instead mandates conversion or dismissal if the movant establishes exclusive cause, and no unusual circumstances establish that conversion or dismissal is not in the best interest of creditors." However, "[w]hether cause exists under § 1112(b) and, if so, whether dismissal [or conversion] is appropriate are questions left to the sound discretion of the bankruptcy court."

In re New Towne Development, LLC, 404 B.R. 140, 146 (Bankr. M.D. La. 2009) (citations omitted). Thus, absent a showing of "unusual circumstances," if the moving party establishes that cause exists, it is the Court's obligation to dismiss or convert a Chapter 11 case. In re New Rochelle Telephone Corp., 397 B.R. 633, 640 (Bankr. E.D.N.Y. 2008).

> [If] there is cause, no contravening unusual circumstances, and no applicable exceptions, the Court must convert or dismiss the Debtor's case pursuant to section 1112(b). The test for determining one over the

>other is whether conversion or dismissal is in the best
>interests of creditors and the estate.  11 U.S.C. §
>1112(b)(1).

In re Pittsfield Weaving Co., 393 B.R. 271, 276 (Bankr. D.N.H. 2008).

 Pursuant to § 1112(b)(1), the initial burden lies with the movants to establish cause for conversion.  In re Gateway Access Solutions, Inc., 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).  "Cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," as well 15 other enumerated grounds included in § 1112(b)(4)(A) through (P).  The statutory list of causes is not exhaustive.  In re Reagan, 403 B.R. 614, 620 (B.A.P. 8th Cir. 2009); In re DCNC North Carolina I, LLC, 407 B.R. 651, 665 n.30 (Bankr. E.D. Pa. 2009).  The moving party need not show all the enumerated items under § 1112(b)(4), even though BAPCPA inserted the word "and" instead of "or," which is likely a scrivener's error.  In re Products Int'l Co., 395 B.R. 101, 109-110 (Bankr. D. Ariz. 2008) (collecting cases).

 A court may consider other factors and equitable considerations in order to reach an appropriate result in the individual case.  In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990).  Negative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b).  Loop Corp. v. United States Trustee, 379 F.3d 511, 515-16 (8th Cir. 2004).  The commission of a crime with components of fraud and dishonesty is not excluded from consideration under § 1112(b).  In re Jayo, 2006 WL 2433451, at *8 (Bankr. D. Idaho 2006).

>Once "cause" has been demonstrated, the Court must
>convert or dismiss, unless the Court specifically
>identifies "unusual circumstances ... that establish
>that such relief is not in the best interest of
>creditors and the estate."  11 U.S.C. § 1112(b)(1).
>However, absent unusual circumstances, the Court must
>not convert or dismiss a case if [the debtor or other
>objecting party establishes that] (1) there is a
>reasonable likelihood that a plan will be confirmed
>within a reasonable time, (2) the "cause" for dismissal
>or conversion is something other than a continuing loss
>or diminution of the estate coupled with a lack of
>reasonable likelihood of rehabilitation; and (3) there
>is reasonable justification or excuse for a debtor's
>act or omission and the act or omission will be cured
>within a reasonable time.  11 U.S.C. § 1112(b)(2).

In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D.N.M. 2008).

Thus, once cause has been established, the burden shifts to the objecting parties to prove the case falls within the "unusual circumstances" exception to § 1112(b)(1)'s mandatory dismissal. In re Dovetail, 2008 WL 5644889, at * 4 (Bankr. N.D. Ill. Dec. 31, 2008). The Code does not define "unusual circumstances." Id. "Nevertheless, 'the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding.'" Id. at 149, citing 7 Collier on Bankruptcy ¶ 1112.04[3], p. 1112-26 (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. rev. 2008). The phrase contemplates conditions that are not common in Chapter 11 cases. Pittsfield Weaving Co., 393 B.R. at 274. Courts have significant discretion in determining whether unusual circumstances exist which weigh against conversion or dismissal. Products Int'l Co., 395 B.R. at 109.

Also, if cause has been demonstrated, whether or not the motion to convert or dismiss is opposed, the court must determine whether the best interests of creditors and the estate are served by converting or dismissing the case. In re Modanlo, ---- B.R. ----, 2009 WL 2923999, at *6 (Bankr. D. Md. June 1, 2009). The court may consider whether creditors favor conversion or dismissal when determining the best interests of creditors or the estate. Loop Corp. v. United States Trustee, 290 B.R. 108, 115 (D. Minn. 2003), aff'd 379 F.2d 511 (8th Cir. 2004).

In In re Byram Rentals, Inc., 410 B.R. 620, 622 (Bankr. W.D. Ark. Aug. 20, 2009), the court found cause existed to dismiss a case where the debtor's business was the operation of thirty-two rental units. In that case, a receiver had been appointed prepetition. Id. at 621. The court decided creditors would be better served if the case was dismissed where the debtor had a consistent pattern of failing to maintain insurance, had failed to pay real property taxes and owed delinquent taxes, had co-mingled personal and business expenses, and had made no payments to the secured creditor in over a year. Id. at 622.

**ANALYSIS**

The record presented establishes Debtor's estate is in considerable disarray. Debtor has failed to make payments to secured creditors since well before he filed his bankruptcy petition in May 2009. There is no explanation in the record for

11

the fact that rents from early 2009 and security deposits have not been identified.  Property taxes are unpaid and insurance coverage is often questionable.  The first few months of Trustee's employment has lead to substantial costs of administration due to Debtor's lack of financial records and the poor condition of the rental properties.  This has contributed to Trustee's inability to increase the occupancy rate of the rental units.

When the record is viewed as a whole, the Court is left with the abiding conclusion that Debtor's financial condition is in such a state that losses are escalating and the value of the overall estate is rapidly decreasing.  The Court finds that movants have established loss to or diminution of the estate.

The record supports a finding of an absence of a reasonable likelihood of rehabilitation.  Debtor has proposed a plan which a majority of creditors have already indicated they will reject.  The plan assumes a higher than normal occupancy rate, a lower than normal interest rate, and lower than normal payments to secured creditors.  The evidence shows little probability that Debtor's entire portfolio of properties will produce a positive cash flow in order to pay creditors, taxes, insurance and other expenses at any time in the foreseeable future.  Based on these findings, the moving parties have met their burden to prove "cause" under § 1112(b)(4)(A).

Other factors which support a finding of cause under § 1112(b) include Debtor's history of failing to pay real estate taxes, Debtor's failure to account for prepetition rents and security deposits, and findings of fraudulent conduct by Debtor in both civil and criminal proceedings.  Although these facts occurred prepetition, they have relevance to this Court's determinations as Debtor, himself, appears to be advocating management of his business through this Chapter 11 case.

All of the foregoing is compounded by Debtor's conviction in Federal court on multiple counts of fraud.  The basis for the conviction was not extrinsic to Debtor's estate, but inextricably intertwined with his numerous holdings.  Debtor owes various lending institutions between 45 and 50 million dollars.  He awaits sentencing with the prospect of substantial time in prison.  He has shown an inability to candidly account to his lenders in the past.  The various lenders have a substantial interest in these properties.  To allow Debtor to utilize this amount of money, either by himself from prison, or indirectly with inexperienced surrogates in a potential confirmed Chapter 11 plan, is not reasonable.  Because of these factors, the Court

concludes that movants have established cause as defined by the Bankruptcy Code.

Because the moving parties have established "cause" to convert the case under § 1112(b)(1), the objecting parties, i.e. Debtor, Trustee and Simmons Perrine, assume the burden to establish "unusual circumstances" which weigh against conversion. These parties argue that more time is needed to determine whether the business can produce a positive cash flow. These arguments, however, ignore the fact that the defaults in payments on secured loans and property taxes have been ongoing for more than a year. In addition, a majority of the properties have been in the hands of receivers and Trustee for the past several months, with no indication that cash flow is improving. The objectors also assert significant equity exists in the properties. Neither Trustee nor Debtor has provided convincing evidence that the value of the real estate exceeds secured claims.

The Court finds that the objecting parties have failed to establish "unusual circumstances" under § 1112(b)(1) which convinces this Court that conversion is not in the best interests of creditors and the estate. U.S. Trustee and a great majority of the secured creditors seek conversion of this case to Chapter 7. Three creditors holding mortgages on a majority of Debtor's real estate already had receivers in place pursuant to prepetition foreclosure proceedings. The best interests of creditors and the estate are met by converting this to Chapter 7 to provide for an orderly liquidation of assets. Debtor's alternative of stretching out mortgages for 30 years with less than market-rate interest while preventing creditors from enforcing their rights is not in the best interests of creditors and the estate and does not promote the legitimate purposes of Chapter 11.

**WHEREFORE**, the Motions to Convert this case to Chapter 7 filed by U.S. Trustee and Heritage Bank are GRANTED.

**FURTHER**, this case is converted from Chapter 11 to Chapter 7.

DATED AND ENTERED: October 9, 2009

_____
PAUL J. KILBURG
U.S. BANKRUPTCY JUDGE